IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EUGENE O'MALLEY, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | **3:17-CV-01419** |
| | : | **(JUDGE MARIANI)** |
| DOWD MARKETING, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On August 10, 2017, Plaintiff Eugene O'Malley brought suit against Sundance Vacations, Inc.[1] Plaintiff filed an Amended Complaint (Doc. 8), a Second Amended Complaint (Doc. 16) and, with leave of Court (Doc. 25), a Third Amended Complaint.

Defendant Dowd Marketing, Inc. ("Dowd") moved to dismiss Plaintiff's Third Amended Complaint (Doc. 26). Plaintiff's Third Amended Complaint alleged ten counts: Count One for "Interference with Plaintiff's Rights Under the Family and Medical Leave Act"; Count Two for "Retaliation in Violation of the Family and Medical Leave Act"; Count Three for "Interference in Violation of the Family and Medical Leave Act"; Count Four for "Retaliation in Violation of the Family and Medical Leave Act"; Count Five for "Failure to Accommodate in Violation of the Americans with Disabilities Act"; Count Six for "Failure to Accommodate in Violation of the Pennsylvania Human Relations Act"; Count Seven for

"Unlawful Retaliation in Violation of the Americans with Disabilities Act"; Count Eight for "Unlawful Retaliation in Violation of the Pennsylvania Human Relations Act"; Count Nine for "Unlawful Discrimination in Violation of the Americans with Disabilities Act"; and Count Ten for "Unlawful Discrimination in Violation of the Pennsylvania Human Relations Act." (*See* Doc. 25).

On November 15, 2018, Magistrate Judge Carlson issued a Report and Recommendation ("R&R") (Doc. 46) wherein he recommended that Counts One and Three of Plaintiff's Third Amended Complaint be dismissed but that Dowd's Motion be denied in all other respects. This Court adopted the R&R by Order dated December 3, 2018 (Doc. 47) and accordingly, Counts One and Three of Plaintiff's Third Amended Complaint were dismissed.

On April 10, 2019, Defendant Dowd filed a Motion for Summary Judgment (Doc. 53). The Motion has been fully briefed and is ripe for disposition.

For the following reasons, the Court will grant in part and deny in part the Defendant's Motion.

## II. STATEMENT OF UNDISPUTED FACTS

Plaintiff Eugene O'Malley was hired in 2013 to work at Dowd Marketing as a computer programmer (Def's. Statement of Material Facts ("DSOMF"), Doc. 54, at ¶ 1). The Plaintiff was promoted to the position of Project Manager in 2015. (*Id.* at ¶ 2).

---

[1] Dowd Marketing, Inc. was substituted for Sundance Vacations, Inc. on Plaintiff's Amended Motion

Mr. O'Malley received a $10,000 salary increase in April 2015 in relation to his promotion to Project Manager. The raise was made retroactive to the date that Mr. O'Malley began serving as Project Manager. (*Id.* at ¶ 5).

Defendant's Statement of Material Facts states:

At the suggestion of a representative of Dowd Marketing's human relations department, on October 21, 2015, Mr. O'Malley requested leave under the Family and Medical Leave Act ("FMLA") to be with his father who was sick. Dowd Marketing's Human Resources Manager, Kelly Valovich, forwarded to Mr. O'Malley a copy of the FMLA request form to complete and told him that "you are approved for FMLA unless told otherwise." Mr. O'Malley never returned the completed form because his father passed away a short time after he received the blank form.

(*Id.* at ¶ 6)(internal citations omitted). Plaintiff's response to this SOMF "admits in part and disputes in part the statements contained therein." (Plaintiff's "Counter-Statement of Facts" ("PCSOF"), Doc. 60 at ¶ 6). While Mr. O'Malley states that he "disputes the suggestion that he took this leave 'at the suggestion of' Dowd or its agents", he admits the other statements of fact set forth in Defendant's SOMF ¶ 6, specifically, that Dowd's human resources manager forwarded to him a copy of the FMLA request form to complete and told him that he was approved for FMLA unless told otherwise. (PCSOF, at ¶ 6).

Plaintiff O'Malley received a salary increase in the amount of $2,000 in December of 2015 in connection with his year end review. (DSOMF, at ¶ 7).

Mr. O'Malley received a written performance review on December 11, 2015. Therein, he was rated as having met or exceeded expectations in all categories listed on the

---

to Substitute Party (Doc. 40) which this Court granted on June 26, 2018. (Doc. 41).

form, including attendance. There were no deductions or deficiencies in his evaluation and Mr. O'Malley did not challenge any of the entries on the form. (*Id.* at ¶ 8). Although Plaintiff states that "he disputes" the statements in the DSOMF ¶ 8, his deposition testimony presents admissions of the facts set forth in this SOMF. Mr. O'Malley, when deposed, testified as follows:

**Q:**    So who reviewed your performance in December of 2015?

**A:**    I believe Marvin did.

**Q:**    And Marvin assessed your performance as meeting requirements in all areas, correct?

**A:**    I believe so.

**Q:**    You got no checkmarks for unsatisfactory performance, right?

**A:**    Nope, not seeing none.

. . . .

**Q:**    And you received no entries in marginal, right?

**A:**    No.

**Q:**    And you received a number of entries for exceptional performance, right?

**A:**    Yes.

**Q:**    And a number of entries for exceeds requirements.

**A:**    Uh-huh.

**Q:**    And the remainder were meets requirements.

4

**A**:    Yes.

  . . . .

**Q**:    So were there any deficiencies?

**A**:    No, I guess not that would be.

**Q**:    And did you note any inaccuracies or did you challenge anything on this report?

**A**:    No. Not that I believe.

(O'Malley Dep., at 39:6-40:5; 40:21-25).

Plaintiff O'Malley "admits that he requested that he be permitted to work from home

in early 2016." (PCSOF, at ¶ 9; *see* DSOMF, at ¶ 9). In his response, Mr. O'Malley asserts

that he "suffers from chronic, severe back pain that began with an automobile accident in

2008." (PCSOF, at ¶ 9). He further asserts that he "requested flex time and the ability to

work from home due to his disability from the beginning of his employment" and that the

Defendant provided these "accommodations" from "approximately 2013 to 2016." (*Id.*). Mr.

O'Malley admits that "Defendant adopted a policy in or about 2016 that forbid employees

from working from home except for a company 'emergency' or a 'critical event.'" (*Id.*).

Plaintiff O'Malley admits the facts set forth in DSOMF ¶ 10 which states:

> Mr. O'Malley had previously asked Anna Pugliese in Dowd Marketing's Human Resources Department about working from home. Ms. Pugliese advised Mr. O'Malley via email on June 29, 2015 that her understanding is that "no one is allowed to work from home." In his email to Ms. Pugliese, Mr. O'Malley references having custody of his kids and wanting to be able to "work extra . . . from home."

(DSOMF, at ¶ 10)(internal citations omitted).

In response to ¶ 11 of DSOMF, Mr. O'Malley "admits that Defendant's policy forbidding employees to work from home was applicable to all employees, regardless of whether (as was the case with Mr. O'Malley) the request was made as an accommodation for a disability." (PCSOF, at ¶ 11).

Mr. O'Malley's performance review for 2016 states that he met expectations in all categories, including attendance. Mr. O'Malley received a $3,500 raise effective December 12, 2016. (DSOMF, at ¶ 12; PCSOF, at ¶ 12).

Although Mr. O'Malley denies that he was never disciplined for missing time or for coming in late or leaving work early (PCSOF at ¶ 13), Mr. O'Malley's deposition testimony is to the contrary. Plaintiff testified that in 2017 he was told by Marvin Metzger that he missed "too many days" and that he needed to "be here." (O'Malley Dep., at 89:1-10).

Mr. O'Malley testified, however:

**Q**: Despite that, you were never written up for missing time?

**A**: No.

(*Id.* at 90:9-11). Mr. O'Malley also testified that: "I was never told I was slated for termination. I was told that I missed too many days and that I need to be here." (*Id.* at 88-89:2).

In response to ¶ 14 of DSOMF, O'Malley, while denying that he was upset on April 27, 2017 when he learned that he would remain in the office to which he had been assigned and would not be moving to a larger office at the rear of the IT room, acknowledges that he

6

"complained because he had been moved to [a] smaller, unheated office that he described as a 'closet'.'" (PCSOF at ¶ 14).

With respect to ¶ 15 of Dowd's SOMF, Mr. O'Malley responds by denying the statements contained therein, specifically that he gave notice to his supervisor, SuAnn Ritter, that he decided to leave Dowd Marketing and was looking for another job. (*Id.* at ¶ 15). Here again, however, Plaintiff's counsel's denial is at variance with Plaintiff O'Malley's deposition testimony. Plaintiff O'Malley testified as follows with respect to what he told Ms. Ritter:

**Q**: Well, you gave her notice that you were looking for employment elsewhere.

**A**: I was told her I was looking for a job elsewhere. I said it would be no time soon. I said I'd give her plenty of notice and help her anytime she wanted.

(O'Malley Dep., 91:24-92:4).

When Mr. O'Malley left Dowd Marketing, Inc. in May of 2017, he had available vacation time. (DSOMF, at ¶ 19; PCSOF, at ¶ 19).

Plaintiff O'Malley admits that he missed work on May 2, 2017 due to a "stomach issue." (PCSOF, at ¶ 20). Otherwise, Plaintiff's response to Dowd's SOMF ¶ 20 neither admits nor denies the specific statements therein. Specifically, O'Malley does not admit or deny whether he left early on April 24, 2017 because he was "tired" or that he "took April 28, 2017 off because he was 'still not feeling good.'" (*See* DSOMF, at ¶ 20; PCSOF, ¶ 20). Plaintiff's refusal to admit or deny these paragraphs when obligated to do so under Fed. R. Civ. P. 56 and Middle District of Pennsylvania Local Rule 7.6 is not proper and these

7

statements will be deemed admitted. See *Rau v. Allstate*, -- F. App'x -- 2019 WL 6358755,

at *2 (3d Cir. 2019).

On May 8, 2017, Mr. O'Malley sent an email to Mr. Dowd asking, without an

explanation, "do you mind if I work from home this afternoon?" Mr. Dowd in turn responded:

> You and I discussed this issue previously. You are welcome to take the time off you need but we do not want to have you working from home. Hopefully you understand and respect my position on this issue.

(DSOMF, at ¶ 21).

While admitting these facts, Mr. O'Malley also adds that he responded by email to

Mr. Dowd stating:

> John sorry I thought you said we continue as we have been doing, which has been on and off from being able to work [from home]. I work from [home] as recently as middle of April but I will not ask anymore as I now understand your stance.

(PCSOF, at ¶ 21).

Defendant's SOMF states that "Mr. O'Malley never requested FMLA leave in relation

to any medical condition affecting himself." (DSOMF, at ¶ 25). In response, Mr. O'Malley

states he "disputes the statements therein." (PCSOF, at ¶ 25). However Mr. O'Malley's

deposition testimony cannot be reconciled with this denial and therefore paragraph 25 of

Dowd's SOMF is admitted.    Mr. O'Malley's deposition testimony is as follows:

> **Q**:    Did you ever ask for FMLA paperwork in relation to your own condition, any condition that affected you personally?
>
> **A**:    No.

**Q**:     How about your children, did you ever have a need to –

**A**:     No.

**Q**:     Did you ever have a need to ask for FMLA leave for your children?

**A**:     No.

**Q**:     And how about your – you told us earlier about your aunts, and they had issues.  Did you ever request FMLA leave in connection with any other family member?

**A**:     Not my aunts, no.

**Q**:     Any other family member?

**A**:     Not that I can recall, no.  It was my dad.  And actually I think that's the first time I've heard of FMLA.  I don't remember who told me to ask for it.

(O'Malley Dep., at 227:1-20)

Plaintiff O'Malley, in his deposition acknowledged that he had a conversation with

Dowd's CEO Marvin Metzger in early 2016 at which time he was told he was not permitted

to have a flex schedule or to work from home.  (*Id*. at 78:14-20).  O'Malley further testified:

**Q**:     And after that point was there any occasion where you worked a flex schedule performing work from home?

**A**:     No.  At that point in time is when I started asking the Dowds about it.

(*Id.* at 79:23-80:2).

O'Malley testified to his discussions with John Dowd:

**Q**:     Tell me about the discussion or discussions you had with John Dowd.

**A**:     When I asked him about working from home he told me he didn't think it was the best interest of this company at this time.

9

I asked him that I was able to do it in the past. He told me that if you were able to do it in the past, that was the past. Now we're not able to do it.

I told him that's one of the reasons I was hired under presumptions that I was able to do this. I mean I have a disability, my back hurts, I get really bad shooting pains. I mean, while it might not happen every day, it happens a few times a year where I have a hard time walking, and I have really, really bad pains. And that's one of the reasons I went to Dowd Marketing because they still offered that.

**Q**:     I'm sorry.

**A**:     He told me he understood that, but he didn't want it anymore from there on out. And this was towards the end of before I was let go. So last few months.

(*Id.* at 80:21-81:17).

Mr. O'Malley testified that was the only time he discussed that issue with John Dowd.

(*Id.* at 81:24-82:5).

Mr. O'Malley testified that John Dowd offered him time off in lieu of working from home which would include his vacation time and going home without pay. (*Id.* at 84:14-17).

Plaintiff further testified that he spoke with John Dowd sometime before May 1, 2017 and that Dowd told him that he could take a day off, use a vacation day or half a vacation day, and he would not be required to use his days in a row. (O'Malley Dep., at 159:24-160:3; 164:5-9).

On May 2, 2017, Mr. O'Malley sent an email to John Dowd and Jackie Quigley advising them that "I will not be in today, my stomach is bothering me. If needed, call cell phone." (*Id.* at 181:13-24).

10

On May 9, 2017 at 8:44 a.m., Mr. O'Malley sent an email to John Dowd and Jackie

Quigley in which he stated "I will not be able to make it in today." (*Id.* at 182:9-15).

Plaintiff acknowledged that he sent an email to John Dowd after May 9 in which he

wrote "do you mind if I work from home this afternoon." He acknowledged the emails were

sent after he was planning to leave employment with Dowd. (*Id.* at 183:2-13). In response,

O'Malley John Dowd stated by email:

> We previously discussed this. You are welcome to take time off you need,
> but we do not want [to] have you work from home. Hope you understand and
> respect my position on this issue.

(*Id.* at 183:17-21).

When asked what was the "final straw" that led him to decide he had to leave

employment with Dowd, Mr. O'Malley testified:

> It was because I couldn't get the time off from work that I needed to when I
> needed to use flex time or I needed to go work from home.

(*Id.* at 142:17-20). When asked whether he had ever asked for time off that he was refused

or denied, Mr. O'Malley testified:

> **A**:     Yes. Back when my father was sick. After that, that stint with SuAnn,
> no, I was told I had to take my vacation times. That's why I burnt up eight
> days of vacation in four months.
>
> **Q**:     Okay. So you were always allowed to take time off when you weren't,
> you weren't well for whatever reason, you were allowed to take time off?
>
> **A**:     Yes.

(O'Malley Dep., at 142:24-143:8).

Mr. O'Malley also testified:

**Q**: Well, when did you ask for time off and it was denied you?

**A**: It was not denied me, but I was told I cannot work from home. And, like I said, you take eight days at four months, you times that out by a year, that's 24 days.

Ten days plus five days you can use and you get fired. Am I doing the math wrong? That's 13 more days than I should be taking off a year before getting fired.

So but that's what it came down to. I told them I burnt through my days. I didn't have the time because you took away my flex time. You took away my ability to work from home. That's what the ultimate decision was.

The office I was upset about, of course anybody would be upset about, but that was not the reason.

And I didn't separate from the company. They brought me into the room with Tommy and Tina Dowd and fired me on the spot, and told me I'm no longer here. So my separation was nothing. They're the ones that separated from me.

(*Id.* at 143:17-144:14).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

The Defendant has separately addressed each of the remaining eight counts of Plaintiff's Third Amended Complaint. Those counts are Counts Two, Four, Five, Six, Seven, Eight, Nine and Ten.

In Count Two of his Third Amended Complaint,[2] Plaintiff alleges that "Sundance willfully retaliated against Mr. O'Malley for asserting his right to leave under the FMLA by taking his FMLA protected leave into account in a negative manner in Mr. O'Malley's performance evaluation." (Doc. 25, at ¶ 65).

"To succeed on an FMLA retaliation claim, a plaintiff must show that '(1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights.'" *Ross v. Gilhuly*, 755

---

[2] Count Two is entitled "Retaliation in Violation of the Family and Medical Leave Act (Leave to Care for Parent)".

F.3d 185, 193 (3d Cir. 2014)(quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)) (internal brackets omitted).

In its brief in support of summary judgment, Dowd argues that "Mr. O'Malley fails to make out a *prima facie* case of FMLA retaliation or raise a genuine dispute for trial because he did not suffer any adverse employment action." (Doc. 55, at 9). In support of this assertion, Dowd argues that "Mr. O'Malley was rated as having met or exceeded all categories in his December 2015 review." (*Id.*). Further, while Dowd acknowledges that the performance review noted that Mr. O'Malley missed "extra days" in 2015 due to family illness and deaths, he was still rated as having met expectations with regard to attendance. (*Id.* at 9-10). Dowd argues that Plaintiff received a $2,000 raise as a consequence of his review which was "consistent with his other year-end review and was in addition to the $10,000 raise that he received in April 2015 in connection with his promotion to project manager." (*Id.* at 10).

Defendant cites to several cases in support of its argument that Plaintiff suffered no adverse employment action. Thus, in *Clark v. Philadelphia Housing Authority*, the plaintiff alleged that she had been punished and ultimately fired for taking off time from work even though she was rightfully entitled to take the time pursuant to the FMLA. The Court of Appeals, in affirming the District Court's dismissal of Clark's retaliation claim, stated:

> Clark does allege that she received an adverse performance review after she sought, but was denied, FMLA leave in April of 2014. That performance review, which simply noted that she "can improve on her attendance record to enhance her career potential even further," does not constitute an adverse

employment action sufficient to support her retaliation claim. The Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In the context of this case, Clark must allege facts from which it could be inferred that the unfavorable performance review adversely affected the terms or conditions of her employment.

701 F.App'x. 113, 117 (3d Cir. 2017).

Here, Dowd argues that it is undisputed that Mr. O'Malley was rated as having met or exceeded all categories in his December 2015 review and that, accordingly, the review does not constitute an adverse employment action sufficient to support his retaliation claim. Dowd also argues that Plaintiff O'Malley received a $2,000 raise as a consequence of the review and cites to *Tucker v. Merck & Co., Inc.*, 131 F.App'x. 852, 857 (3d Cir. 2005) for the proposition that, as the Court noted in *Tucker*, "even a *negative* evaluation that leads to a lower than expected merit wage increase or bonus probably does not constitute an adverse employment action." (*See* Doc. 55, at 10)(emphasis added). *See also, Rabinovitz v. Pena*, 89 F.3d 482, 488-489 (7th Cir. 1996); *E.E.O.C. v. Wyeth Pharm.*, 2004 WL 503417, *2 n.3 (E.D. Pa. 2004). As noted herein, Plaintiff did not receive a negative evaluation.

Plaintiff O'Malley, in response, cites no case law contrary to that cited by Defendant Dowd. Instead, O'Malley argues, citing to the Magistrate Judge's R&R in this case, that "'[g]enerally, for an action to be considered materially adverse, the action must have "dissuaded a reasonable worker" from using his FMLA rights.'" (Doc. 61 at 3). From this,

Plaintiff argues that "[a] reasonable jury could determine that a reduction in compensation of $1,500 would dissuade a reasonable worker from using FMLA leave. " (*Id.*).

Plaintiff mischaracterizes the sequence of events when he states that he sustained a reduction in compensation of $1,500. Rather, the undisputed evidence of record shows that he received an increase of $2,000 in December of 2015, an amount less than what he received in 2016, but he overlooks his receipt of a $10,000 salary increase in April of 2015 in relation to his promotion to Project Manager.

Dowd, in its Reply brief, reiterates that Plaintiff received a 2015 performance review that rated him as having met or exceeded requirements in all categories and was accompanied by a raise which as a matter of law, does not constitute an adverse employment action. (Doc. 64, at 1-2). Dowd cites the cases which it had previously cited in its brief in support of its motion for summary and notes that "Mr. O'Malley does not and cannot cite any authority which holds otherwise." (*Id.* at 3). Thus, Dowd argues that "Mr. O'Malley has not satisfied his burden of proving any 'materially adverse' consequence resulting from his 2015 review and therefore fails to make out a *prima facie* case of retaliation." (*Id.*). The Court agrees. Neither the performance evaluation which, as noted herein, rated Plaintiff O'Malley as having met or exceeded all performance expectations, nor the $2,000 raise that he received based on that performance evaluation, present adverse employment actions against him which would support a claim for retaliation in Count Two.

Accordingly, Defendant's motion for summary judgment on Plaintiff's Count Two will be granted.

Dowd also seeks judgment as a matter of law on Plaintiff's retaliation claim in Count Four, asserting that O'Malley did not receive a negative performance evaluation or suffer any adverse employment action.

In Count Four,[3] Plaintiff alleges that the Defendant "willfully retaliated against Mr. O'Malley for asserting his right to leave under the FMLA by taking his FMLA protected leave into account in a negative manner in Mr. O'Malley's performance evaluation." (Doc. 25, at ¶ 74).

Here, Dowd's argument is straight-forward. Dowd argues that Mr. O'Malley admitted that he never requested FMLA leave in relation to any health condition affecting himself and that, having failed to request FMLA leave, he cannot satisfy the first element of an FMLA retaliation claim.

Indeed, Mr. O'Malley testified that he never requested FMLA paperwork in relation to his own condition or with respect to his children or other relatives. Plaintiff's deposition testimony is as follows:

**Q**:    Did you ever ask for FMLA paperwork in relation to your own condition, any condition that affected you personally?

**A**:    No.

---

[3] Count Four is entitled "Retaliation in Violation of the Family and Medical Leave Act (Leave for Employee's Own Serious Health Condition)."

**Q:** How about your children, did you ever have a need to –

**A:** No.

**Q:** Did you ever have a need to ask for FMLA leave for your children?

**A:** No.

**Q:** And how about your – you told us earlier about your aunts, and they had issues. Did you ever request FMLA leave in connection with any other family member?

**A:** Not my aunts, no.

**Q:** Any other family member?

**A:** Not that I can recall, no. It was my dad. And actually I think that's the first time I've ever heard of FMLA. I don't remember who told me to ask for it.[4]

(O'Malley Dep., at 227:1-20).

In *Chamberlain v. Wyoming County*, the District Court, in declining to reconsider its grant of summary judgment in favor of the employer on a retaliation claim where the employee did not request FMLA leave, addressed the issue now before this Court, *i.e.*, whether the Plaintiff-employee's failure to invoke his right to FMLA leave precludes a retaliation claim. In so doing, it stated:

As to plaintiff's FMLA retaliation claim regarding her May 2014 hospitalization, as the court found in its prior memorandum, plaintiff failed to present sufficient evidence that she invoked her right to FMLA-qualifying leave for this hospitalization. "To succeed on an FMLA retaliation claim, a plaintiff must show that '(1) she invoked her right to FMLA-qualifying leave, (2) she suffered

_____

[4] There is no dispute that Mr. O'Malley did not return the completed FMLA request form after he requested leave based on his father's illness because his father passed away a short time after Mr. O'Malley received the blank form. (*See* DSOMF, at ¶ 6).

an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.'" *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014) (citing *Lichtenstein*, 691 F.3d at 302). Before taking leave, an employee must give their employer adequate notice about their need to take FMLA leave and "state a qualifying reason for the needed leave." 29 C.F.R. § 825.301(b); *see also Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 153 (3d Cir. 2015). Although an employee does not need to specifically and expressly request leave under the FMLA to qualify for protection, 29 C.F.R. § 825.301(b), the employee does have to provide some notice to make the employer aware that the employee needs FMLA-qualifying leave and how long that leave will be. *Id.* § 825.302(c). In determining whether the employee's notice to her employer was adequate, consideration must be given to "how the information conveyed to the employer is reasonably interpreted." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007).

2019 WL 108847, at *3 (M.D. Pa. 2019). *See also, Parrotta v. PECO Energy Company*, 363 F.Supp.3d 577, 604 (E.D. Pa. 2019) (wherein plaintiff "admitted under oath he did not request FMLA leave.").

Here, the pivotal assertion in Count Four of Plaintiff's Third Amended Complaint is that the Defendant retaliated against Plaintiff for *asserting his right to leave under the FMLA* by taking his FMLA protected leave into account in a negative manner in Mr. O'Malley's performance evaluation. This memorandum has previously addressed Plaintiff's assertion that his leave was taken into account in a negative manner in his 2015 performance evaluation, and rejected such assertion. Because the evaluation showed that Mr. O'Malley met or exceeded all of his job requirements and responsibilities and specifically that the Plaintiff's attendance met his employer's expectations, the Plaintiff did not suffer an adverse employment action either in connection with the performance evaluation or the raise he

received.  Merely because Plaintiff's performance evaluation noted that "Gene missed extra

days due to family illness and deaths" (Employee Performance Update, Doc. 60-2), this did

not cause the Plaintiff to receive a negative evaluation with respect to attendance.  Instead,

as noted, the evaluation form notes that Plaintiff met the attendance requirements for 2015.

More importantly, however, Plaintiff O'Malley has admitted that he did not "assert" his right

to leave under the FMLA as alleged in paragraph 74 of the Complaint. Because Count Four

specifically founds Mr. O'Malley's retaliation claim on the theory that he was retaliated

against because he asserted his right to leave under the FMLA for his "own serious health

condition" (*see* Doc. 25, at 11), O'Malley's admission that at no time did he actually assert

this right under the FMLA requires the entry of summary judgment against him as to Count

Four of his Complaint.

In Count Five of his Third Amended Complaint, Mr. O'Malley alleges that he was an

individual with a disability within the meaning of that term as set forth in the Americans With

Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"); that at all

times Defendant was aware of his disabilities and the accommodations that he required;

that the employer perceived Plaintiff to be a person with a disability although Plaintiff was

able to perform the essential functions of his job with or without reasonable

accommodations; and that Plaintiff O'Malley requested that Dowd provide reasonable

accommodations to him "to allow him to continue performing his job, such as time off of

work and permission to work from home when his disabilities prevented him going into the

office." (Doc. 25, at ¶¶ 77-81). Mr. O'Malley thus alleges that Defendant failed to provide reasonable accommodations to him as required by law and that Dowd failed to engage in good faith in the interactive process required by law. (*Id*. at ¶¶ 82-83).

In Count Six of the Third Amended Complaint, Plaintiff repeats the allegation that Dowd failed to provide reasonable accommodations to him and failed to engage in the interactive process in good faith as required by law in violation of the PHRA. (*Id.* at ¶¶ 86-87).

Dowd moves for summary judgment with respect to Count Five and Count Six for two reasons.

First, Dowd asserts that Plaintiff's claims in Counts Five and Six are untimely in that Mr. O'Malley filed his charge of discrimination with the EEOC and the PHRC on or after November 7, 2017. (Doc. 55, at 13). Dowd has attached Mr. O'Malley's charge of discrimination in support of its motion (Doc. 55-1) which bears a stamp showing receipt by the EEOC on November 7, 2017.

Dowd correctly asserts that "[u]nder the ADA, a plaintiff has 300 days from the alleged unlawful employment practice to file a charge of employment discrimination with the U.S. Equal Employment Opportunity Commission." (Doc. 55, at 13) (citing 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1)). Thus, the Supreme Court in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 110 (2002) flatly stated "[a] party,

therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."[5]

Dowd thus argues that since Plaintiff O'Malley filed his charge with the EEOC on or after November 7, 2017, "he can only challenge employment decisions that allegedly occurred after January 11, 2017 – 300 days before the charge was filed." (Doc. 55, at 13-14). In support of this argument, Dowd states that "Mr. O'Malley testified that he was [sic] received notice on June 29, 2015 and again on March 8, 2016 that, consistent with company policy, he would not be permitted to work from home." (Doc. 55, at 14)(citing DSOMF, at ¶¶ 9, 10).

Plaintiff O'Malley "admits that he requested that he be permitted to work from home in early 2016." (PCSOF, at ¶ 9). Plaintiff further admits Dowd's SOMF ¶ 10 which states:

Mr. O'Malley had previously asked Anna Pugliese in Dowd Marketing's Human Resources Department about working from home. Ms. Pugliese advised Mr. O'Malley via email on June 29, 2015 that her understanding is that "no one is allowed to work from home." In his email to Ms. Pugliese, Mr. O'Malley references having custody of his kids and wanted to be able to "work extra . . . from home."

(DSOMF, at ¶ 10; PCSOF, at ¶ 10).

In response to Defendant's argument with respect to timeliness, O'Malley essentially argues for the application of a continuing violation theory, arguing that his requests for accommodation were made in 2015 and 2016 as set forth in Defendant's SOMF ¶¶ 9 and

---

[5] In *Mandel v. M&Q Packaging Corp.*, 706 F.3d. 157, 165 (3d Cir. 2013), the Third Circuit made clear that the 300-day extended statute of limitations applies only to the EEOC charge and not to the PHRA

10, recounted above, but that he continued his accommodation request and made a request to Dowd "'within the last two months of me being let go.'" (Doc. 61, at 7).

Plaintiff's reasonable accommodation claim based upon a continuing violations theory has been rejected by the Third Circuit. In *Mercer v. SEPTA*, the Court of Appeals affirmed the lower court's reasoning that a plaintiff's requests for accommodation were not continuing violations "because the denial of a reasonable accommodation is a discrete event." 608 F.App'x. 60, 63 (3d Cir. 2015). *See also, Zdziech v. DaimlerChrysler Corp.*, 114 F.App'x 469, 472 (3d Cir. 2004) (rejecting Plaintiff's "theory" that Defendant's "continued refusal to return him to work should be considered a continuing act of ongoing discrimination", thus creating a continuing violation, and explaining that allowing Plaintiff "to establish a continuing violation by repeatedly asking for reinstatement is contrary to the policy rationale of the statute of limitations.")(internal quotation marks omitted).

The argument raised by the plaintiff in *Mercer* and rejected by both the District Court and the Court of Appeals bears strong resemblance to that advanced by Mr. O'Malley as the following passage from *Mercer* shows:

> The District Court correctly dismissed Mercer's reasonable accommodation claim as time-barred. Under the ADA, a plaintiff must file a claim with the EEOC within 300 days of the action complained of in order not to be time-barred on that claim. 42 U.S.C.A. § 2000e–5(e)(1). (This requirement is provided for in Title VII of the Civil Rights Act of 1964.) Mercer filed his EEOC charge on July 8, 2011. As such, the District Court considered only those events after September 11, 2010, 300 days prior, in evaluating his reasonable

---

filing which must be accomplished within 180 days as provided for in the Pennsylvania Human Relations Act. *See* 43 Pa. Stat. § 959(h).

accommodation claim. Mercer argues that while his formal requests for accommodation, through his doctor's notes, took place before September 11, he continued to request accommodation throughout the summer of 2010, and SEPTA continued to deny this request by making him work on overheated buses through October 2010. He argues that these incidents should restart the clock, under a continuing violations theory. The District Court correctly rejected this argument for two reasons: (1) Mercer's requests for accommodation, assuming they were denied, were not continuing violations because the denial of a reasonable accommodation is a discrete event, and (2) Mercer had not demonstrated an independently recoverable denial of a requested accommodation after September 11, 2010.

A reasonable accommodation request is a one-time occurrence rather than a continuing practice, and therefore, does not fit under the continuing violations theory. *Aubrey v. City of Bethlehem*, 466 Fed.Appx. 88 (3d Cir. 2012). In *Aubrey*, we held that continuing violations theory does not apply to denial of reasonable accommodation under ADA because the nature of such a claim does not involve repeated conduct. *Id.* at 92. . . .

*Id.*

For these reasons, Plaintiff's claim of a violation of the Americans With Disabilities Act based upon a failure to accommodate him (Count Five) and his identical claim for a failure to accommodate in Count Six based upon the Pennsylvania Human Relations Act are time barred and will be dismissed.

Although the Court has found Plaintiff's claims to be time barred in Counts Five and Six of his Complaint, Dowd further argues that even if Plaintiff's claims were determined to be timely, it is nonetheless entitled to summary judgment on these claims because the Plaintiff's request that he be allowed to work from home does not present a request for a "reasonable accommodation" and that O'Malley therefore did not suffer an adverse employment action.  (Doc. 55, at 15-16).

Plaintiff's ADA and PHRA discrimination and retaliation claims are evaluated using the well-established *McDonnell Douglas* burden shifting framework.[6]  *See e.g. Hatch v. Franklin Cty.,* 755 F.App'x 194, 198 (3d Cir. 2018)(applying the *McDonnell Douglas* framework to ADA and PHRA discrimination claims).

"In order to establish a prima facie case of disability discrimination, Plaintiff must show: '(1) [he] is disabled within the meaning of the ADA; (2) [he] is otherwise qualified to perform the essential functions of the job; and (3) [he] has suffered an adverse employment decision because of discrimination.'" *Keyhani v. Trustees of Univ. of Pa.,* 2019 WL 2568279, at *4 (E.D. Pa. 2019) (quoting *Gagliardo v. Connaught Labs., Inc.,* 311 F.3d 565, 568 (3d Cir. 2002)).  Once the plaintiff has established a *prima facie* case, the defendant "then bears the burden to produce a legitimate, non-discriminatory reason for the adverse employment action" and "[i]f the defendant makes such a showing, the burden then shifts back to the plaintiff to demonstrate that the defendant's purported reason was really pretext for discrimination." *Hatch,* 755 F.App'x at 198.

In *Keyhani,* the Court began its analysis by observing that "[t]he majority of Plaintiff's claims rise and fall on one issue: whether she was entitled to the accommodation of her choice (working from home two days per week).  The law is clear that Plaintiff was entitled to reasonable accommodations, but not the accommodation of her choice."  2019 WL 2568279, at *3.

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The plaintiff in *Keyhani* worked for the University of Pennsylvania as a Project Manager in Penn's Design and Construction Department of Facilities and Real Estate Services. *Id.* at *1. On December 10, 2015, Plaintiff tripped on a sidewalk at work and fell to the ground. She was referred to Penn Medicine and subsequently cleared for work with sedentary duties the next day. She was later re-evaluated by Penn Medicine and cleared for work without limitations. *Id.* Later, however, Plaintiff reported to a Penn Medicine physician that she suffered from concussion type symptoms "such as forgetfulness, difficulty concentrating, dizziness, and headaches." *Id.* The physician to whom she had reported her symptoms indicated that Plaintiff would "benefit from working from home with rest breaks throughout the day." *Id.*

Thereafter, another Penn Medicine physician recommended that Plaintiff be able to work from home two to three days per week. Plaintiff provided a note from the physician incorporating this recommendation to her supervisor. Although the Plaintiff initially began working from home two days per week, she was later not permitted to work from home although she was authorized to limit her work week to three days per week. *Id.* at *2. Defendant accommodated Plaintiff "by permitting her to wear sunglasses and use noise-cancelling headphones during the three days per week that she was at work." *Id.* The plaintiff received FMLA leave on June 16, 2016, retroactive to February 2, 2016. She was paid by Defendant for three days of work per week while Workers' Compensation paid for the other two days off. Plaintiff used her allotted sick leave, paid time off, and FMLA unpaid

27

leave to cover the two days off per week. *Id.* On October 7, 2016, the Plaintiff provided her Defendant-employer with a note from her treating physician which cleared her for work for three days per week in a work space where she could control light and sound, take rest breaks, and could limit sustained computer use. Also recommended by Plaintiff's physician was allowing her to work from home the other two days of the work week. On November 7, 2016, the Defendant declined to extend Plaintiff's reduced work schedule accommodation asserting that "it had created significant operational challenges and that continuing it would generate undue hardship." *Id.* Subsequently, Plaintiff's physician provided a note stating that Plaintiff could work five days per week for six hours per day. Plaintiff returned to a full-time schedule but was permitted to continue wearing sunglasses and noise cancelling headphones. *Id.* She thereafter filed suit, alleging, *inter alia,* a failure to accommodate.

The District Court granted Defendant's motion for summary judgment on Plaintiff's claims of a failure to accommodate as well as a claim that she had suffered an adverse employment action.

The District Court's analysis includes a recitation of the applicable law regarding a request that an employee be accommodated by being permitted to work from home:

> Plaintiff's main argument is that Defendant retaliated against her by refusing to provide her preferred accommodation – working from home two days per week. However, as discussed above, this refusal cannot be an adverse employment action since Plaintiff was provided with legally adequate alternative accommodations which kept her working and eventually allowed her to return to full-time employment. *See Garner v. Sch. Dist. of Philadelphia*, 63 F.Supp.3d 483, 500 (E.D. Pa. 2014) (providing that a plaintiff

cannot maintain an ADA retaliation claim premised on a failure to accommodate as it is merely an ADA discrimination claim repackaged).

Plaintiff additionally contends that she was retaliated against for filing her disability, FMLA, and Workers' Compensation claims in that: she was required to exhaust her paid time off and sick leave before being allowed to use unpaid FMLA leave; she was removed from several projects; she was yelled at once by Buchman because her calendar was inaccessible to her supervisors; Dausch was frustrated with her need for accommodations; other unidentified Project Managers thought she was faking her disability; and Defendant altered her work hours.

. . . .

. . . [R]equiring Plaintiff to exhaust her paid time off and sick leave before allowing her to use unpaid FMLA leave is contemplated under the regulations and is considered a reasonable accommodation under the law. 29 C.F.R. pt. 32, App. A (providing that employers "may be required to grant liberal time off or leave without pay when paid sick leave is exhausted"); 29 C.F.R. pt. 1630, App. ("accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment"); *Congleton v. Weil McLain*, No. 01-cv-2237, 2003 WL 22100877, at *7 (E.D. Pa. Aug. 19, 2003) (holding that a "reasonable accommodation for a disability can include 'permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment'" (quoting *Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1168 (10th Cir. 1996))); *Hankins*, 84 F.3d at 801-02 (concluding that allowing the use of paid sick leave and personal days, a voluntary time-off program, and vacation time were reasonable accommodations). Therefore, the Court concludes that requiring Plaintiff to use paid leave before unpaid leave is not an adverse employment action.

*Keyhani*, 2019 WL 2568279, at * 6.

Here, Plaintiff O'Malley was provided with reasonable accommodations as his deposition testimony establishes. Mr. O'Malley testified:

**Q:** As you sit here today, do you recall asking for a particular day off that was refused?

**A:** Not to my recollection, no, I can't say, I can't. Not the specifics to actually say to put it on record.

(O'Malley Dep., at 30:19-23). Plaintiff also testified that he was allowed to take time off

when he was not well for whatever reason:

**Q:** Okay. So you were always allowed to take time off when you weren't, you weren't well for whatever reason, you were allowed to take time off.

**A:** Yes.

(*Id.* at 143:5-8).

And again, when he was asked whether he requested time off and was denied,

Plaintiff responded:

**A:** It was not denied me, but I was told I cannot work from home. And, like I said, you take eight days at four months, you times that out by a year, that's 24 days.

Ten days plus 5 days you can use and you get fired. Am I doing the math wrong? That's 13 more days than I should be taking off a year before getting fired.

So but that's what it came down to. I told them I burnt through my days. I didn't have the time because you took away my flex time. You took away my ability to work from home. That's what the ultimate decision was.

The office I was upset about, of course anybody would be upset about, but that was not the reason.

(*Id.* at 143:17-144:9). The record is also clear that when Mr. O'Malley on May 8, 2017

asked by email to Mr. Dowd if he "minded" if he worked from home, Mr. Dowd responded:

"You are welcome to take the time off you need but we do not want [to] have you working

from home . . ." (O'Malley Dep., at 183:18-20).

Thus, Plaintiff has failed to establish a *prima facie* case of disability discrimination. According every favorable inference to Plaintiff and assuming that he is disabled within the meaning of the ADA by virtue of a major life impairment, specifically his back related pain and inability to walk or work at various times, as Mr. O'Malley himself described it ("I mean I have the disability, my back hurts, I get really bad shooting pains. I mean, while it might not happen every day, it happens a few times a year where I have a hard time walking, and I have really, really bad pains. And that's one of the reasons I went to Dowd Marketing because they still offered that." (O'Malley Dep., at 80:21-81:17)) and further assuming that Plaintiff is otherwise qualified to perform the essential functions of his job, he has not suffered an adverse employment decision. Plaintiff has failed to establish a *prima facie* case of discrimination based on the Defendant's refusal to allow him to work from home on a flex schedule because the evidence shows that Defendant made a good faith effort to reasonably accommodate him.

This determination is supported by *Whelan v. Teledyne Metal Working Products*, 226 F.App'x 141 (3d Cir. 2007). There, the plaintiff had a degenerative eye disease that occluded his central vision. Initially, Defendant Teledyne granted his request for a transfer to an outside sales job in another division of Teledyne. Two years later, Plaintiff advised Teledyne that he could not longer work in the outside sales job because of his worsening vision. Teledyne then provided Whelan with a computer and special software to allow him to work as a marketing coordinator out of his home in Pittsburgh. *Id.* at 143. Because of its

financial conditions, Teledyne subsequently consolidated operations in its Grant, Alabama facility. Teledyne determined that Whelan would have to move to Grant and it could no longer permit him to continue working from home in Pittsburgh. *Id.* at 144. Plaintiff was unwilling to move to Alabama and insisted that he be allowed to work from his home in Pittsburgh. Teledyne informed Whelan that it would terminate him if he did not transfer, and when he did not respond, Teledyne terminated him. *Id.*

Whelan brought claims against Teledyne alleging that he was terminated because of his disability and that Defendant failed to provide a reasonable accommodation to him and failed to engage in the ADA's' "interactive process" in good faith. The matter proceeded to trial and the jury found Whelan qualified but found that Teledyne was not liable for discriminatory discharge termination or failure to reasonably accommodate. *Whelan*, 226 F.App'x at 145. On appeal, Plaintiff sought judgment as a matter of law. The District Court denied the motion and the Court of Appeals affirmed. With respect to the plaintiff's claim that Teledyne did not provide him with a reasonable accommodation before firing him, the Court stated:

> When an employee "insists on a single accommodation that is unreasonable as a matter of law, then the employee will be at fault for the breakdown in the interactive process." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 316 n. 7 (3d Cir. 1999) (discussing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576 (3d Cir. 1998)). The record supports a finding that working from home was unreasonable. Teledyne had consolidated marketing operations in Grant in order to enhance supervision in the department and realize administrative efficiencies. By the end of 1998, Whelan was the only non-outside salesperson working outside of Grant. Whelan's insistence on working from

home would deprive Teledyne of the efficiency gains and better quality work product it wanted from consolidation.

*Id.* at 146.

Here, Plaintiff O'Malley has insisted on a single accommodation – that he be allowed to work from home when he deems it necessary because of pain in his back or difficulty walking as a result of his back condition. In response, the undisputed record evidence demonstrates that O'Malley was never disciplined for missing time; that he was always allowed to take time off when he was not well for any reason; that there was no occasion when he asked for time off and it was denied him and instead his complaint was that the company "took away my ability to work from home." (O'Malley Dep., at 142:18-20; 142:24-143:8; 143:17-144:14). Moreover, Defendant Dowd provided O'Malley with a reasonable accommodation via time off.

Because Plaintiff O'Malley has failed to establish a *prima facie* case, the affirmative defense of undue burden, and the need to assert it, was not triggered. *See Khoury v. Secretary United States Army*, 677 F. App'x. 735, 737 (3d Cir. 2017) ("Because we agree with the District Court that the Army provided a reasonable accommodation . . . we find that Khoury failed to establish a *prima facie* case that would trigger the need for the affirmative defense of undue burden."). *See also*, *Whelan*, 226 F.App'x at 147 ("Failure to participate in the interactive process is not a ground for liability unless the employee has proven a failure to accommodate, namely, that a reasonable accommodation existed and the employer unreasonably failed to provide it.").

Thus, even if Mr. O'Malley's claims that he was not reasonably accommodated were not time-barred, he has failed to state a *prima facie* case of discrimination based on his insistence of working from home as the only acceptable accommodation.

Moreover, it is worth noting that Dowd met the Plaintiff's request for an ergonomic chair in response to a note from Dowd's physician. Plaintiff has placed of record a hand written note from Advanced Pain Management Specialists, P.C. dated April 3, 2017, which states with respect to Mr. O'Malley:

> To whom it may concern,
>
> The above-named employee is a patient being treated for a back condition. He requires an ergonomic chair and the ability to stand and walk for a couple of minutes every hour.

(Doc. 60-13; *see also*, Dowd Marketing 30(b)(6) Witness Dep., Doc. 60-9, at 71:8-25). The signature of the specific physician is illegible and not otherwise identified in the record.

There is no dispute that Dowd acquired an ergonomic chair for O'Malley. Plaintiff O'Malley, in responding to Dowd's statement of material facts states:

> By way of further response, to help ameliorate the effects of Defendant's refusal to allow him to work from home, Mr. O'Malley requested a new chair to assist with his disability. The request for an ergonomic chair was made in March of 2017. Mr. O'Malley gave Defendant a medical note regarding his disability and the need for an ergonomic chair on or around April 3, 2017. Mr. O'Malley received the ergonomic chair from Defendant. This chair was different from the chairs that Mr. O'Malley is able to use at home to work during a severe bout of back pain.

(PCSOF, at ¶ 24)(internal citations omitted). In stating that the ergonomic chair offered by Dowd was different than the chairs Mr. O'Malley is "able to use at home to work during a

34

severe bout of back pain", Plaintiff cites to his Declaration. (*Id.*). However, Mr. O'Malley's Declaration is not accurately quoted by Plaintiff's counsel. The Declaration, in paragraph four states:

> During episodes of severe pain I am able to work at home by using a "zero-gravity" chair, or by using a reclining chair. The chairs I use at home are different from the chair provided to me by Dowd Marketing, and provide *better relief* from my pain.

(Doc. 60-21 at ¶ 4)(emphasis added).

Plaintiff O'Malley's admission that Dowd, in response to his request, provided him with an ergonomic chair in accordance with his request and the medical note he submitted, shows an additional accommodation made to Plaintiff O'Malley at his request. The fact that O'Malley asserts that the chairs that uses at his home provide "better relief" from his pain does not diminish the reasonableness of Dowd's accommodation through its providing of an ergonomic chair along with a promise that he is able to take time off due to his back pain as needed. Further, Plaintiff has not come forward with additional facts showing that he specifically made a request for a different kind of chair to be used at work or that he informed any representative of Dowd of any further need for accommodation through a different type of chair. "An employer is not liable if the employee fails to supply it information necessary to devise an appropriate accommodation . . . ." *Whelan*, 226 F.App'x at 146. Further, the case law in this Circuit makes clear that "'[a]n employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation.'" *See Yovtcheva v. City of Phila. Water Dep't*,

518 Fed. App'x 116, 122 (3d Cir. 2013)(quoting *Gile v. United Airlines, Inc.* 95 F.3d 492, 499 (7th Cir. 1996)).

For the afore-discussed reasons, summary judgment will be entered in favor of Dowd and against Mr. O'Malley on Counts Five and Six of his Third Amended Complaint.

Dowd Marketing next argues that it is entitled to summary judgment on Plaintiff O'Malley's ADA and PHRC retaliation claims in Counts Seven and Eight.

Count Seven of Mr. O'Malley's Third Amended Complaint alleges that he "engaged in protected activity, including requesting accommodations for his disabilities and questioning Sundance's decision to withdraw established accommodations" and that Defendant retaliated against him "for asserting his rights under the [ADA] by, *inter alia*, terminating his employment." (Doc. 25, at ¶¶ 90, 91).

Similarly, in Count Eight, O'Malley alleges a violation of the PHRA on the same basis, *i.e.* that he engaged in protected activity by requesting accommodations for his disabilities and questioning his employer's decision to withdraw established accommodations and that Dowd retaliated against him for asserting these rights by terminating his employment. (*Id.* at ¶¶ 94, 95).

Dowd argues that O'Malley did not suffer an adverse employment action because "Mr. O'Malley, not Dowd Marketing, initiated his separation." (Doc. 55 at 16). Dowd argues that "Mr. O'Malley gave notice to his supervisor that he was looking for a new job and that he would be leaving Dowd Marketing." *Id.* Dowd further argues that on May 1, 2017, Mr.

O'Malley sent an email to the President of Dowd Marketing "advising that he was 'looking for employment elsewhere'" and that Plaintiff sent an email to a "key vendor" stating that he was "leaving" Dowd Marketing "'over the next couple of months due to personally (sic) reasons.'" *Id*. at 16-17. Defendant additionally asserts that O'Malley gave notice to his colleagues that he was leaving and that he began to transition his work duties. *Id.* at 17. Accordingly, Dowd, citing cases for the proposition that a resignation is not an adverse employment action, seeks the entry of summary judgment in its favor on Counts Seven and Eight. It further notes that Mr. O'Malley has not claimed to have been constructively discharged and that, in any event, he could not satisfy the burden of demonstrating constructive discharge since he "cannot point to any arguably intolerable conditions that might have caused a reasonable employee to believe he or she had no choice but to resign." *Id.* at 17 n.5.

Dowd offers a second argument in support of its motion for summary judgment on Plaintiff's Counts Seven and Eight. It argues that Mr. O'Malley "has failed to adduce any evidence suggesting a causal connection between any request for a flex-time schedule and the decision to accept his resignation." (Doc. 55, at 18). Down asserts that Plaintiff was advised in March of 2016 that he would not be permitted to work from home, a fact that this Court has found to be admitted. (*See id.*; DSOMF, at ¶ 9). Thus, Dowd argues that the "14-month lapse between this notice and the acceptance of his resignation in May 2017

conclusively dispels any suggestion of retaliation and requires the conclusion that there is no genuine issue for trial on the retaliation claim." (Doc. 55 at 18).

Dowd argues as a third basis for its request for summary judgment on Counts Seven and Eight that Plaintiff has not pointed to "any arguably protected conduct between the date he tendered his resignation and the date his resignation was accepted." (*Id.* at 19). Dowd notes that Mr. O'Malley requested time off on April 28, 2017 because he was "'not feeling good'", on May 2, 2017 because his "'stomach [was] bothering [him]'", and on May 9, 2017 based on O'Malley's representation that he "'will not be able to make it in today.'" (*Id.*). Dowd thus argues that Mr. O'Malley "did not request an accommodation or allude to any medical condition that might arguably constitute a disability at any time after he gave notice that he was leaving. Accordingly, he did not engage in protected conduct necessary to make out a *prima facie* claim of retaliation." (*Id.*).

Finally, Dowd states that it had a legitimate, non-discriminatory reason for accepting Mr. O'Malley's resignation, specifically that Mr. O'Malley refused to attend a meeting concerning a significant project, the Concord project, on May 10, 2017, which Dowd argues was the basis for "the decision to accept [O'Malley's] resignation." (*Id.* at 19-20).

Plaintiff has responded to Defendant's arguments by stating that his termination "was not voluntary." (Doc. 61, at 12). He argues that he did not set a resignation date and argues that he "hoped that by telling Defendant that he was forced to leave, Defendant would pay attention to the seriousness of his accommodation requests." (*Id.*). Further, Mr.

O'Malley argues that he had prior permission not to attend the meeting concerning the Concord project from John Dowd. (*Id.*; PCSOF, at ¶ 22).

Mr. O'Malley distinguishes Dowd's citation to *Foster v. New Castle Area School District*, 98 F.App'x 85, 89 (3d Cir. 2004), by arguing that in contrast to the plaintiff in *Foster* who submitted a resignation letter stating that her resignation was "effective immediately", Mr. O'Malley merely told Defendant that he had decided to leave because Defendant refused to accommodate his disability and gave no effective date for such departure, further noting that the Defendant did not request one. (Doc. 61, at 13).

A review of the record evidence first shows that whether Plaintiff O'Malley resigned or was terminated from his employment presents material facts in sharp dispute. Mr. O'Malley, at his deposition, testified:

> And I didn't separate from the company. They brought me into the room with Tommy and Tina Do[wd] and fired me on the spot, and told me I'm no longer here. So my separation was nothing. They're the ones that separated from me.

(O'Malley Dep., at 144:10-14). Later in his deposition, Mr. O'Malley testified that he had a meeting with John Dowd on the 8th or 9th of May 2017 where he told Mr. Dowd:

> . . . And I said your wife fired me because of the meeting I didn't come to, and said I was unreliable, and then you told me I didn't have to go to those meetings.
>
> And he told me the decision was made and that's final. He didn't give me no other further explanation than that.

(*Id.* at 205:7-13). Mr. O'Malley further testified that he asked Mr. Dowd why he was fired, testifying:

I asked him why I was fired, I didn't understand. I said and she mentioned the meeting you said I didn't have to go to. And he said, regardless, the decision was made. He didn't bother giving me any further explanation after that.

(*Id.* at 206:3-7).

The record, however, also shows that by email dated May 1, 2017, Mr. O'Malley

informed John Dowd as follows:

I wanted to see if you have time to talk today. I am sure SuAnn let you know that I am looking for employment elsewhere as I felt like I have been wronged again. I would just like to simple [*sic*] talk about this with you and also about handbook as when I was hired; one of the main reason I did come to Sundance was I was promised flex time and ability to work from home only when needed (once in a while), which I have done multiply [*sic*] times in the past here at Sundance. I would like to be able to leave in good terms when I do give notice. Please let me know if you have time to talk today.

(Doc. 60-15, at 3).

Mr. O'Malley sent a similar email to Evan Green on May 1, 2017 where he wrote:

Evan I was wondering if you have a few minutes to talk. I am leaving Sundance over the next couple of months due to personally [*sic*] reasons I have with management. John asked if I would be willing to work for Concord but he told the same thing to Shawn when he left as well. Just seeing if the business is being truthful with me or not as they want me to teach someone over the next couple of months before I leave.

(Doc. 54-10).

Mr. O'Malley sent another email dated May 1, 2017 to Niki Lordanov and Yannis

Yankov in which he stated:

Guys tomorrow Mark will be running scrum. We are making a transition as I have decided to leave Sundance. I am not sure how long I will be here at Sundance going forward.

But I will say that I have enjoyed working with you both. At all times you have been professional, good attitudes no matter what was thrown at you. I have the upmost respect for you both and hope you have a great careers and I know you will be valuable to anyone you work for or with. Probably as Sundance is years away from moving marketing and sales to a CRM.

(Doc. 54-12).

Thus, the record demonstrates material disputes of fact as to whether Dowd terminated Mr. O'Malley for missing the Concord meeting on May 10, 2017, or whether his email to John Dowd presents an independent and final decision on his part to leave his employment with Dowd Marketing. To the extent, therefore, that Dowd seeks summary judgment on the basis that Mr. O'Malley was not terminated but instead resigned his employment, summary judgment will be denied. Whether Mr. O'Malley suffered an adverse employment action by virtue of a termination by Dowd presents a factual dispute for trial.

However, Plaintiff has not pleaded a claim of constructive discharge in his Third Amended Complaint. He seeks to escape this lapse by inserting a footnote in his brief in opposition, stating: "Even if Mr. O'Malley had walked out instead of notifying Defendant that he planned to leave, it would be best understood as a constructive termination rather than a voluntary resignation. See *Smith v. Henderson*, 376 F. 3d 529 (6th Cir. 2004)." (Doc. 61, at 12 n.11). This Court will not analyze claims made for the first time in a brief. "It is well established that a plaintiff may not attempt to amend his complaint through his brief." *Marshall v. Penn Twp.*, 2009 WL 3241873, at *8 n.9 (W.D. Pa. 2009) (citing *Commw. of Pa. ex. rel. Zimmerman v. Pepsico, Inc.*, 836 F. 2d 173, 181 (3d Cir. 1988)); *Marshall v. Penn*

41

*Twp.*, 458 F.App'x 178, 181 (3d Cir. 2012) ("the District Court properly found that [claims not included in the Complaint] could not be asserted for the first time in a brief submitted in connection with the parties' cross-motions for summary judgment."). *See also, Janowski v. City of North Wildwood*, 259 F.Supp.3d 113, 120 (D.N.J. 2017) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to the motion to dismiss.").

Although Mr. O'Malley may not now assert that he was constructively discharged, assuming that he was terminated by Dowd, there remains the need to address whether the adverse employment action of termination was the result of retaliation against him based on his protected activity of seeking accommodations for a back-related disability under the ADA.

Plaintiff has submitted a document entitled "Employee Health Statement" wherein he acknowledged, in question 6, that he had been medically diagnosed and treated for his "back", a document which he completed at the time of his hire which is dated June 22, 2013. (Doc. 60-10). He likewise submitted on April 3, 2017, the previously quoted note from Advanced Pain Management Specialists, P.C. (Doc. 60-13) which notes that he was being treated for a back condition. Plaintiff has also submitted a "New Patient Evaluation" medical report from Wyoming Valley Pain Clinic & Rehabilitation Center wherein it is noted that Mr. O'Malley "sustained an injury of his neck and back in a motor vehicle accident on January 5, 2008." (Doc. 60-14). This Evaluation details the nature of Mr. O'Malley's injury as well as the existence of "degenerative changes along the cervical and upper thoracic spine with a small right paracentral disc herniation and possible extrusion at T1-T2." (*Id.* at 1). The

Evaluation likewise notes "posterior disc protrusion noted at T2-T3," and an MRI of the lumbar spine taken on January 10, 2008, which showed "degenerative changes at the left L4-5 disc protrusion annular tear which causes moderate left neural foraminal narrowing." (*Id*.). The Evaluation notes the impression of the examining physician, Dr. Jacob as including "cervical sprain and strain," "cervical radiculopathy," "aggravation of preexisting cervical disc disease," "thoracic disc injury with herniation T1-T2, T2-T3, and T4-T5," "lumboscacral sprain and strain," "lumbar radiculopathy," "aggravation of preexisting lumbar disc disease" and "spasm of muscles." (*Id.* at 3).

There is thus sufficient evidence to create an issue for trial as to whether Mr. O'Malley suffered from a disability, as well as whether Mr. O'Malley sought accommodations for this condition. Likewise, there is evidence of record to create an issue for trial as to whether Mr. O'Malley suffered an adverse employment action – termination – which was causally related to his asserted disability and request for accommodations. Therefore, summary judgment must be denied.

Dowd argues that Mr. O'Malley "was advised on March 2016 that he would not be permitted to work from home" and that the "14-month lapse between this notice and the acceptance of his resignation in May 2017 conclusively dispels any suggestion of retaliation and requires the conclusion that there is no genuine issue for trial on the retaliation claim." (Doc 55, at 18). However, there is evidence of record creating genuine disputes of fact as

to the sequence of events with respect to Mr. O'Malley's request for accommodations and his departure from employment at Dowd, on or about May 11, 2017 (*see* Doc. 25, at ¶ 39).

On March 2, 2017, Plaintiff wrote to SuAnn Ritter via email stating: "If my back does not start to feel better, I need to take a half day. To be honest with you with everything going on I think I need to be bale [*sic*] to work from home or start looking for a job where I can. I am in a lot of pain sitting in these chairs." (Doc. 60-11, at 3). Previously, Mr. O'Malley on March 31, 2017, had emailed Ms. Ritter asking if he could "get out a little early, it's one of those days with the rain my back is killing me." (*Id.* at 4). (*See also id.* at 5 (email from Mr. O'Malley stating: "SuAnn, I am in a lot of pain today because of back. I do not think I can make through the day the way my back feels, the chair is not helping at all. I will definitely wait till 1130 so it's a half day. Days like today upset me I cannot work from home, I know it is not your choice but it still feels unfair how they pick and choose. Sorry for rant.")).

In the May 1, 2017 email wherein Mr. O'Malley informed John Dowd that he was looking for employment elsewhere because he "felt like I have been wronged again", he stated that "one of the main reason I did come to Sundance was I was promised flex time and ability to work from home only when needed (once in a while), which I have done multiply [*sic*] times in the past here at Sundance. . . ." (Doc. 60-15, at 3).

Further, Mr. O'Malley testified at his deposition that he was told by Marvin Metzger, Dowd's CEO in 2017, that he "missed too many days" and that he needed to be present at work. (O'Malley Dep., at 89:9-10; 90:2-5). Mr. O'Malley also testified that he had one or

two conversations with SuAnn Ritter concerning his disability and his desire to work flex

time or to be able to work from home as follows:

> **Q**:     And your testimony is you had one or two conversations with SuAnn
> Ritter about this is 2017, is that your testimony?
>
> **A**:     About leaving the company?
>
> **Q**:     Yes.
>
> **A**:     Definitely one.  I brought up more than one time about how I need
> accommodations for my disability and I can't be in the office all the time
> though.  That was multiple times conversations. So I think that's where you're
> getting all the multiple conversations from.

(*Id*. at 130:12-22).

Here, there is arguably sufficient temporal proximity between Mr. O'Malley's

protected activity of seeking accommodations and complaining about what he believed to

be a refusal by Dowd to grant him those accommodations as well as a pattern of

antagonism between Dowd and Marvin Metzger and John Dowd to present disputes of fact

that preclude summary judgment.

In *Williams v. Philadelphia Housing Authority Police Department*, the Third Circuit

identified precisely what a plaintiff must do to establish a *prima facie* case of illegal

retaliation:

> "[I]n order to establish a *prima facie* case of illegal retaliation under the anti-
> discrimination statutes, a plaintiff must show: '(1) protected employee activity;
> (2) adverse action by the employer either after or contemporaneous with the
> employee's protected activity; and (3) a causal connection between the
> employee's protected activity and the employer's adverse action.'" *Fogleman*

v. *Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

380 F.3d 751, 759 (3d Cir. 2004), *superseded by statute on other grounds*, ADA

Amendments Act of 2008, Pub. L. No. 110-325, § 6, 122 Stat. 3553, 3558 (2008), *as recognized in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 185 (3d Cir. 2019).

The Circuit in *Williams* affirmed the District Court's determination that Williams' termination, which occurred over two months after his request for an accommodation, "was not suggestive of a causal connection between Williams's request for accommodation and termination." *Id.* at 759-760. In explaining its decision, the Court made clear that the use of temporal proximity to support inferentially the existence of a causal link between protected activity and retaliatory conduct must be "unusually suggestive." Thus, it stated:

> We have held in the ADA retaliation context that "temporal proximity between the protected activity and the termination [can be itself] sufficient to establish a causal link." *Shellenberger* [*v. Summit Bancorp, Inc.,* 318 F.3d 183, 183 (3d Cir. 2003)](quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)) (internal quotation marks omitted). However, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Shellenberger*, 318 F.3d at 189 n.9 (quoting *Krouse*, 126 F.3d at 503) (internal quotation marks omitted). For example, two days between the protected activity engaged in and the alleged retaliation sufficed in *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989), to support an inference of a causal connection between the two. Similarly, in *Shellenberger*, comments made by a supervisor suggesting retaliation ten days before termination, along with other evidence of retaliation, were sufficient to establish a *prima facie* showing of causation. *Shellenberger*, 318 F.3d at 189.

> Here, over two months elapsed between the time Williams requested a radio room assignment and the time that he was terminated. In cases like this one,

"where 'the temporal proximity is not so close as to be unduly suggestive,' we have recognized that 'timing plus other evidence may be an appropriate test....'" *Thomas v. Town of Hammonton,* 351 F.3d 108, 114 (3d Cir. 2003) (quoting *Estate of Smith v. Marasco,* 318 F.3d 497, 513 (3d Cir. 2003) (internal quotation marks omitted)).

*Id.* at 760.

The retaliation standard in *Williams* has been consistently followed in this Circuit.

For example, in *LeBoon v. Lancaster Jewish Community Center Association*, the Third

Circuit observed:

We consider "a broad array of evidence" in determining whether a sufficient causal link exists to survive a motion for summary judgment. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). Where the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it is sufficient standing alone to create an inference of causality and defeat summary judgment. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (temporal proximity alone, when "very close," can in some instances establish a *prima facie* case of retaliation); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (reversing summary judgment in favor of the defendant where plaintiff had been discharged two days after his employer's receipt of his EEOC claim). Where the temporal proximity is not "unusually suggestive," we ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." *Farrell*, 206 F.3d at 280 (internal citation and quotation marks omitted). Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Id.* at 279-81. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and

defeat summary judgment. *See Clark County School Dist.* 532 U.S. at 273, 121 S.Ct. 1508 (citing favorably *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997), which rejected such an inference where the events were three months apart); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (five-month time period between employee's complaint and first adverse action was, without additional evidence, insufficient to raise an inference of causation).

503 F.3d 217, 232-233 (3d Cir. 2007).

Whether Mr. O'Malley was the subject of unlawful retaliation under the ADA cannot be resolved on summary judgment. The respective positions of the parties require the resolution of factual disputes which in turn require that credibility assessments be made of the testimony to be presented at trial.[7]

---

[7] *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764 (3d Cir. 2013):

Under Rule 56, . . . a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party asserting that there is a genuine dispute of material fact must support that assertion by "citing to particular parts of ... the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations..., admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A). In evaluating the motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

716 F.3d at 772. *See also, Doebblers' Penn. Hybrids, Inc. v. Doebbler*, 442 F.3d 812, 820 (3d Cir. 2006)(stating that credibility determinations "are inappropriate to the legal conclusions necessary to a ruling on summary judgment. . . .A District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial."); *J. F. Feeser, Inc. v. Serv-A-Portion, Inc.,* 909 F.2d 1254, 1531 (3d Cir. 1990) ("We are keenly aware that credibility determinations are not the function of the Judge; instead the non-movant's evidence must be credited at this stage.").

For these reasons, summary judgment on Counts Seven and Eight will be denied.[8]

Lastly, Dowd Marketing seeks summary judgment on Mr. O'Malley's claims in Counts Nine and Ten of his Third Amended Complaint that he was discharged because of an alleged disability in violation of the ADA and PHRA.

In *Eshelman v. Agere Systems, Inc.*, the Third Circuit noted that it had "recognized that 'analysis of an ADA claim applies equally to a PHRA claim.'" 554 F.3d 426, 433 n.3 (3d Cir. 2009) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)). Thus, the Court limited its discussion of the plaintiff's ADA claims "'because our analysis of th[ose] claim[s] is, under the circumstances of this case, coterminous with the PHRA claim[s].'" *Id.* (quoting *Williams*, 380 F.3d at 762 n.6).

To prevail here under the ADA, Mr. O'Malley must establish that he is a "qualified individual with a disability." 42 U.S.C. § 12112(a).

> The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines "disability" with regard to an individual as either: (i) "a physical or mental impairment that substantially limits one or more of the major life activities of such [an] individual"; (ii) "a record of such an impairment"; or (iii) "being regarded as having such an impairment." 42 U.S.C. § 12102(2).

*Eshelman*, 554 F.3d. at 433.

---

[8] The Court has not made mention of Mr. O'Malley's testimony regarding the loss of his office and his placement in what he terms a "closet". This is so because O'Malley, in his deposition testimony, testified that the reason for his separation was that he was told he could not work from home, adding "the office I was upset about, of course, anybody would be upset about, but that was not the reason." (*See* O'Malley Dep., at 143:11-144:14)

49

While the ADA does not define "major life activity", the definition of that term is set forth in EEOC regulations codified at 29 C.F.R. § 1630.2:

(h) Physical or mental impairment means—

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(i) Major life activities—

(1) In general. Major life activities include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) In determining other examples of major life activities, the term "major" shall not be interpreted strictly to create a demanding standard for disability. ADAAA section 2(b)(4) (Findings and Purposes). Whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life."

(j) Substantially limits—

>    (1) Rules of construction. The following rules of construction apply
>    when determining whether an impairment substantially limits an
>    individual in a major life activity:

>    (i) The term "substantially limits" shall be construed broadly in favor
>    of expansive coverage, to the maximum extent permitted by the
>    terms of the ADA. "Substantially limits" is not meant to be a
>    demanding standard.

>    (ii) An impairment is a disability within the meaning of this section if it
>    substantially limits the ability of an individual to perform a major life
>    activity as compared to most people in the general population. An
>    impairment need not prevent, or significantly or severely restrict, the
>    individual from performing a major life activity in order to be
>    considered substantially limiting. Nonetheless, not every impairment
>    will constitute a disability within the meaning of this section.

>    (iii) The primary object of attention in cases brought under the ADA
>    should be whether covered entities have complied with their
>    obligations and whether discrimination has occurred, not whether an
>    individual's impairment substantially limits a major life activity.
>    Accordingly, the threshold issue of whether an impairment
>    "substantially limits" a major life activity should not demand extensive
>    analysis.

>    (iv) The determination of whether an impairment substantially limits a
>    major life activity requires an individualized assessment. However, in
>    making this assessment, the term "substantially limits" shall be
>    interpreted and applied to require a degree of functional limitation
>    that is lower than the standard for "substantially limits" applied prior
>    to the ADAAA.

29 C.F.R. § 1630.2(h)-(j).

Here, Plaintiff O'Malley has presented evidence of record of a major impairment of a

life activity, specifically walking, sitting, and working.

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must

show:

> "(1) he is a disabled person within the meaning of the ADA; (2) he is
> otherwise qualified to perform the essential functions of the job, with or
> without reasonable accommodations by the employer; and (3) he has
> suffered an otherwise adverse employment decision as a result of
> discrimination."

*Taylor*, 184 F.3d at 306 (quoting *Gaul v. Lucent Techs,* 134 F.3d 576, 580 (3d Cir. 1998));

*see also, Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

Dowd argues that even if Mr. O'Malley were able to demonstrate that he is disabled

within the meaning of the ADA, and Dowd disputes this fact, O'Malley "never made Dowd

Marketing aware of any alleged disabling impairment or resulting substantial limitations."

(Doc. 55, at 21). This assertion presents a dispute of fact which precludes summary

judgment. In addition to Mr. O'Malley's deposition testimony, Mr. O'Malley's supervisor and

chief technology officer sent an email to Jackie Quigley on March 2, 2017 entitled

"Ergonomic Chair for Employee", stating:

> Gene is under a doctor's care for back pain. He said that the chair he
> currently has is causing him pain. Can you help him get a more ergonomic
> chair? Or does he need a doctor's note? Or some other process/approval?

(Doc. 60-11, at 6). What followed was the April 3, 2012 note from Advanced Pain

Management Specialists, P.C. (Doc. 60-13). In addition, a document completed by Mr.

O'Malley for Dowd in June 2013 shows he answered yes to a question which asked him

whether he had every been medically diagnosed or treated for a back disorder. (Doc. 60-

10). Thus, a material dispute of fact exists as to whether Dowd Marketing was aware of any alleged disabling impairment on the part of Mr. O'Malley as a consequence of his back injury or condition.

Next, Dowd argues that Mr. O'Malley "did not suffer any adverse employment action." (Doc. 55, at 21). Here again, as previously discussed herein, there are disputes of fact as to whether Mr. O'Malley resigned, as asserted by Dowd, or was terminated, as Plaintiff asserts.

Finally, Dowd argues that even if Plaintiff were to present proof sufficient to establish the elements of a retaliation claim, Dowd has a legitimate non-discriminatory reason for what it contends that it did, i.e. "accept[ ] his resignation. (Id. at 22). Once again, the "legitimate non-discriminatory reason" offered by Dowd Marketing, specifically that Mr. O'Malley did not attend a meeting as he was required to do on the Concord project, presents a dispute of fact for trial in that Mr. O'Malley contends that the proffered reason for what he terms his termination was a pretext for discrimination against him based on his disability.

As a result, issues of fact preclude the entry of summary judgment on Plaintiff's claims in Counts Nine and Ten of the Third Amended Complaint.

Lastly, Plaintiff O'Malley supplemented his response to Dowd's Statement of Undisputed Material Facts with 12 "additional facts" in separately numbered paragraphs. (See Doc. 60, at 20-21). Dowd contends that this is not authorized under M.D.Pa. Local

Rule 56.1, arguing that Rule 56.1 "provides that an opposition to a summary judgment motion must include a statement 'responding to the numbered paragraphs' in the movant's statement 'as to which it is contended that there exists a genuine issue to be tried.'" (Doc. 64, at 15). Thus, Dowd argues that Plaintiff's additional submission is not permitted by Local Rule 56.1 and should be disregarded. The Court agrees. Mr. O'Malley's additional statement of facts is outside the scope of Dowd's statement of material facts and this Court may properly decide to give the former no evidentiary value. *See Rau*, 2019 WL 6358755 at * 2 (Third Circuit finding no abuse of discretion in District Court's refusal to assign evidentiary value to Plaintiff's counterstatement, which went outside the scope of Defendant's statement of facts, in light of the "latitude given to district courts interpreting their own local rules, Local Rule 56.1's purpose to increase efficiency, and its plain language.").

## V. Conclusion

Accordingly, for the reasons set forth herein, summary judgment will be entered in favor of Defendant Dowd on Counts Two, Four, Five and Six. Defendant Dowd's motion for summary judgment will be denied as to Counts Seven, Eight, Nine and Ten of Plaintiff's Third Amended Complaint.

A separate Order follows.

Robert D. Mariani
United States District Judge